We are ready to hear the appellant in the Blatchley case. Thank you, Your Honor. May it please the Court, my name is Mike Foley. I represent St. Anthony Summit Medical Center, the appellant in this matter. With permission of the Court, I'd like to reserve five minutes. Your time is your own, so just watch the clock. Thank you, Your Honor. This matter stems from a medical malpractice case that was a result of a seven-day trial. It involves a case against not only the hospital, which is the appellant in this case, but originally it involved physicians, physician assistants, and then the nursing staff. This case has multiple issues before the Court. Counsel, at what point prior to the trial did the providers, the medical, the doctor providers, and the PAs become, I guess that's not PAs, it's the licensed nurses, so it's a... No, it's the physician assistants, Your Honor. Yeah, PAs. So, at what point did they settle out before the trial started? They settled out in July, and the trial actually took place in late March of the following year. All right, so you had a lot of notice that you were going to have to have joint tortfeasors named as contributing tortfeasors, right? We identified them immediately upon learning that the case was settled with them. So when did you notify the Court? The day that we had a, I believe it was a pretrial coming up, and we notified the Court the following day that we learned that they settled. So we were notified by counsel that they settled, and then we filed a designation at that point in time, identifying that we would be seeking apportionment as to those settling parties. All right. So Judge Daniels says to you, I'm not going to let you do it on your first basis. He did. Give you an opportunity to try again. I did, Your Honor. In fact, it was our position we didn't need leave of court, and there's no rule that says we do need leave of court for that. In fact, the Redden case, which is the seminal case in Colorado, that party designated, I believe, five times, and then the Court ultimately struck it. In this case, we designated again. We identified very specifically what we were seeking as to these defendants. We identified the fact that their expert reports from the plaintiffs showed exactly what the claims would be against these parties. The entire case had been focused on each one of these physicians up to the settling moment. The case was very little evidence was being presented as to our client and the nurses. So at that point- Did you have to tell the Court at that time what percentage you claimed they were responsible for their negligence contributed to the ultimate injury? Your Honor, we did not have to, but we basically told the Court we were seeking 100% fault towards those settling defendants. Thank you. And are they non-parties, the doctors, under the statute? No, Your Honor, that's an excellent question. In our view, they were parties, and when we actually designated, they were still parties in the case. That's how quickly we moved to tell the parties, we're going to seek apportionment against these defendants. We were told they'd settled, but they hadn't been dismissed from the case. So when we did our original designation, they were actually parties still in the case, and even when we did our second designation, they were still parties in the case, and the docket reflects that. It's also important to note that the trial court essentially acknowledged that our designation, our second one, complied with the Court's interpretation of Redding and the statute, even though we feel there's plenty of case law to suggest we overdid it when we designated and identified the claims we would have. But it's important to note that these defendants had been in the case from day one, expert testimony had been taken regarding these defendants, and the parties were well aware that the focus of this case was solely on those physicians from day one. So if one would read the statute to say that the statute applies, the designation statute applies only to non-parties, and we have the Colorado Court of Appeals saying you become a non-party once you settle, what do we do with that ruling from the Colorado Court of Appeals? I think at that point, once they became non-parties, we didn't believe we had to actually do the formal designation. We believed we had a right to apportionment from the beginning. Has the Colorado Supreme Court given the statute that same interpretation as the Colorado Court of Appeals did in, I think it's Anthony? I believe it has, Your Honor. And that is once you settle, if you're a party and you settle, you magically become a non-party? Because that's really what Anthony says. Well, that's correct, Your Honor. But I think the key to this case is we didn't believe that even applied. We just did it out of abundance of caution. This is what I'm trying to get to the bottom of. Does it apply? No. And what do we rely on to say it doesn't apply? We believe it doesn't apply because Colorado is a pure apportionment state, and we had a right for apportionment from day one in the case, once they were a party. So your argument would not rely on an interpretation of the designation statute? No, because the designation statute, in our view, that's for non-parties. And in this case, while we did it out of abundance of caution and the court was inviting us to do it to some extent, we did it. But we, from day one, asked the court for a right to apportion the liability against these defendants, which the court denied. And eventually you did say that the statute didn't apply, but that came pretty late in the day, did it not? Yes, Your Honor. When was that? The statute applied when we decided. We only did it because we felt the court was requiring us to do it. Right, right. I didn't think the statute ever applied. We thought we should get apportionment. But you raised the argument that it didn't apply at what point? We raised it at the beginning of when we designated. Okay. Thank you. Thank you, Your Honor. With respect to the second argument in this case. Well, on this point, before we leave it, where did Judge Daniel go wrong? I didn't hear you, Your Honor. Where's the error? What is his error? His error is not allowing us to apportion fault against parties in the case. Right, but he had to have a basis for not doing so. That's a good point, Your Honor. His basis was he didn't think it was fair. Fair. Fair. That's what he said in the record. Well, the fair comment came in when he's saying, I'm not going to let you amend your designation. And he also said that at that time he didn't think it was fair, even though we complied with what he thought should have been in the designation. He just said it's not fair to allow apportionment. That's what he said at the end. Not because of the late date, but just on general equitable principles. Correct, Your Honor. They have never argued they were prejudiced in this case at any point in time because of when we decided to designate. There's no arguments in their brief. There was no arguments during the post-trial or pre-trial motions. If I could briefly talk about one of the other main issues in this case, and that is the causation issue. This case is a medical malpractice case that requires expert opinions. At the time of the introduction of evidence on damages by the defendants, did the defendant hospital in any way reduce the amount of the recovery, or did you in any way reduce the amount of your ad damnum amount based upon the previous recovery? Excuse me, not you, but the plaintiffs. No, Your Honor. Your argument, I suppose, would be that there's a windfall because they're not recovering 100% of their damages, but 100 and some percent. That goes to two of our arguments regarding the benefits that the plaintiff receives from New Zealand as well as the argument that we should have received a set-off in this case from the actual settlement. With respect to, if I've answered your question, Your Honor, I'd like to move. With respect to the causation argument, I believe in this case that causation was a key element that plaintiffs failed to present at trial, and since my time is low, I'm going to reserve the remaining time for rebuttal if that's okay. Thank you. Good morning. May it please the Court. Good morning. My name is James Kuga. I represent Jody and Delfina Blatchley. I'm going to divide my time with Benjamin Sachs. I want to address. If previous counsel is correct, and they were entitled to a set-off on the New Zealand statutory benefits that they get, and the fact that you received a settlement amount, plus the fact that you claimed 100% of your damages in the trial and were awarded that amount, it does facially appear that you didn't receive anything like 100 and whatever percent. 100% plus the settlement, plus the New Zealand benefits, assuming they were recoverable. Is that correct? Your Honor, I'm going to have Mr. Sachs address that question. Well, I just want to ask one question in terms of fairness. That just, from where I sit, doesn't strike me as fair. Well, Your Honor, I think that to the extent. That's an equitable question. I understand you'll have other counsel. Mr. Sachs can address that. But in terms of fairness, I mean, it has long been to the extent, and I'm not conceding that there was a windfall. If there is any windfall, that should enter to the injured party, not the tortfeasor. I would also note for the court that, pursuant to Colorado law, well, nearly $3 million of non-economic damages were eliminated pursuant to Colorado law. But with respect to the issues I want to address that Mr. Foley raised, from a medical and factual context, and then Mr. Sachs will address legally, the most critical thing to understand in this case is the causation window of time. And that was a very brief window of time. When the compartment syndrome, this secondary process, became what is called fulminant, meaning it is now causing irreversible injury. And the only expert witness who provided causation testament on when that window of time was, that intervention could have occurred and saved Mr. Blatchley's life was Dr. Pettawitz, a world-renowned expert in compartment syndrome. But not an expert in nursing, right? We had nursing experts. But he was not an expert in nursing, was he? He was not an expert in nursing. Right. Correct. We had nursing experts who testified as to the standard of care of the nurses. The first major deficiency that Judge Daniel recognized with the non-party designations was they provided no statement of the causation window. So it wasn't just this, as they say, unfairness issue or what. It was your designation is deficient. Because we specifically said they need to tell us what the acts of negligence are and what the causation is. The only expert testimony on that was Dr. Pettawitz. They did not endorse expert witnesses on those issues. For them to say that this case was always focused on the physicians is a gross misstatement. We deposed multiple nurses, we had nursing expert witnesses, we had a causation window of time that specifically focused on the nurses. The issues with regard to Dr. James and those who follow on the 8th are an exacerbation of injury. Because once that critical window of time without intervention occurred, the nurses could not be treated. We have a lot of argument in the briefing about exactly what nurses can do. They can't diagnose and they can't treat. And we have also the word intervention, as you just used repeatedly. What were the nurses to do? One, the nurses can't treat. There's numerous things they can do. They can take off the bandages, they can relieve pressure from the leg. In terms of intervention, intervention doesn't just mean medical. They intervene by communicating. The PowerPoint presentations that were used to train the nurses spell it out specifically. The nurses are to call the physician and say, they're actually authorized to say, I want you to come check him for compartment syndrome. I recommend you check the pressures in his leg. So the damage occurred, it is argued, when nurse plant was on duty during those hours? The compartment syndrome became fulminant during those hours and the opportunity to intervene and stop the ischemia, the irreversible ischemia at that point. And the nurse that followed on apparently noted that there was a problem. And what intervention did that nurse pursue? Well, she actually did very conflicting things. So what's important to note is when he comes out of the surgery for the calcaneal repair, Angela Sanders, who is the PACU nurse, the post anesthesia care nurse, reports to Mr. Plant, he can move at the ankle. That's clearly in the record. He can move at the ankle. When anodyne Dayton comes on the next morning, he can no longer move at the ankle. That was lost in that window from irreversible ischemia. And Dayton followed Plant, right? Anodyne Dayton followed Plant. Their own expert witness concedes that there was a major change in function. The loss of the motor occurred in the early morning hours. Was it your assertion that that claimed negligence on the part of the nurse was 100% responsible for the damages? It was 100% responsible for the ability to prevent all damage. Well, thank you for restating my question. But the question is, for 100% of the damages? For 100% of the monetary damages? Yes. I'm going to have Mr. Sachs address the damage issues. I'll wait for Mr. Sachs. Mr. Sachs is going to be getting a lot of questions, obviously. Well, then I should save him some time. If there are other questions on the fact or the medicine. But, Your Honor, to finish up on Anodyne Dayton, she gave very conflicting information. She had a conversation with Dr. James in the record, all of which is charted hours later, which is one of the other things. So we don't really know what contemporaneously happened because they charted so long after the fact. But she then got a phone call from Molly Bryan. Molly Bryan being the PA who told Mr. Plant, follow him closely for compartment syndrome, which Mr. Plant did not do. She gave different information to Molly Bryan than she gave to Dr. James. And Dr. James, this was his first involvement with the patient and didn't have all the history that Molly Bryan had. So there were problems with Anodyne Dayton that morning as well. Although she did recognize the major change in motor function that Mr. Plant missed. Can you speak to designation or do we wait for your co-counsel? I think Mr. Sachs will address specifically the designations, other than the deficiencies in the designation as it related to specific claims as well as a causation time period. For example, if you're going to designate Dr. James, you have to give us causation. That's your obligation when you designate him. They did not do that. I'll yield to Mr. Sachs. Thank you. Good morning. My name is Benjamin Sachs. I think that first. And you represent? The appellees, the Blatchley's. Thank you. I think that I should pick up with your question, Judge Lucero. Oh, yes. Let me give you some predicate for my question. Yes. Apportionment, the principles of apportionment are intended to prevent double recovery. If there are several tort feasors, the law is going to look to make a plaintiff whole, whole being 100%. And to prevent the settlement with one party and then recover the 100% of monetary damages from a remaining tort feasor was considered not to be appropriate, and therefore the Colorado law has developed to provide for apportionment. Surprisingly, apparently the remaining parties can be responsible, even if they are only 10% at fault. So apportionment becomes very important to all defendants and to the plaintiff as well. Now, with that predicate, is it correct that what your clients are recovering here is not 100%, but 100 and some percent, 100% from the remaining defendants and whatever the settlement amount, we don't know what that is, from the doctors and PAs? Is that correct? Well, let me unfold. Just in fairness, it strikes me from where I sit, it's not very fair, and I want you to persuade me that that isn't the case if you can. Well, first of all, I need to unfold some things. So Colorado law squarely holds that the effect of a settlement with settling defendants is a set-off that is an affirmative defense that has to be affirmatively pled. It's a set-off. The Ochoa case, Colorado Court of Appeals, holds that. And in fact, in that case, I just want to point out quickly in passing that Judge Webb raised a question, and he said, you know, normally the rules of civil procedure indicate that that has to be raised as an affirmative defense in an amended pleading or else it's waived. And he cited that offset is an affirmative defense. It remains to be decided whether or not the non-party at fault statute that provides for designation is the equivalent and which one prevails between the statute and the rule. And, of course, we're in federal court, and the federal courts have a substantially similar rule, Rule 8, that normally requires affirmative defenses to be raised affirmatively in an amended pleading. So I just want to point out quickly that that never occurred here. But this is a diversity case, and we're applying Colorado law. Right. So let's say that we're applying the procedural aspects of the non-party at fault statute that provide for a pleading called a designation of non-parties at fault. So the Redden case addresses how that is accomplished, and it points out that if you're going to designate, you have to strictly comply with the requirements of the statute, 1321.111.5 of the Colorado revised statutes. So what Judge Daniel here found, consistent with Redden, was that the defendants, St. Anthony's Summit, did not comply with the requirements procedurally of the statute, and he was correct in so holding. Did the statute even apply to them? Well, he found that it did, and that's because of a single Colorado Court of Appeals decision that this court can take into account in determining applicable Colorado law. That's the Montoya case that's cited. And in Montoya, there was a belated attempt to raise an apportionment of fault defense, and the Colorado Court of Appeals said that when parties settle, there has to be a designation of non-parties consistent with, in compliance with the pro rata liability statute, the procedural aspects of that statute. So they become non-parties. Once they settle, they become non-parties, according to the Colorado Court of Appeals. Yes. Has the Supreme Court of Colorado said that? No. Do they need to say that? For your purposes in prognosticating, no. You can accept intermediate court appeals. I like to just read the statute, and the statute refers to non-parties. Right. And the doctors were not non-parties. Well, as soon as there is a stipulated dismissal, pursuant to Rule 41, then they become... According to the Colorado Court of Appeals. Well, according to the Colorado Court of Appeals, once they become settling parties, and they are dismissed, pursuant to a stipulated dismissal in accordance with Rule 41 of the state rules, which is very similar to the federal rules, then they become non-parties. They're dropped out of the case, and they can be designated. Well, counsel tells us that he did designate them. Well... Not once, he says, but twice. Well... Even though he claims he didn't need to at all. Well, first of all, we disagree with St. Anthony's premise that it wasn't required. Our position is that it's an affirmative defense. It has to be properly raised in amended pleading or in a pleading that comports with the non-party default statute. And it has to be timely asserted as well. So, in this case, Judge Daniel found... Unless Judge Briscoe wishes to give additional time. Go ahead. Go ahead. Go ahead and answer. Answer my question. Oh, I apologize. It's all right. Judge Daniel correctly determined that, in accordance with Redden, that St. Anthony's Summit's initial designation did not comply. And the second was simply a do-over, and he wasn't obliged to allow it. I think my time is up, and I apologize. Thank you. Any other questions? Questions? Thank you. Thank you. Your Honor, let me address the causation evidence in this case. First of all, there is absolutely no expert opinion in this case that complies with the Kaiser decision, that being that Dr. Petowitz came in and said, but for the actions by Nurse Plant, did that cause the injury to this plaintiff. It's also important to note that Dr. Janes was the physician that came in that morning three hours later and assessed the patient and concluded that the patient did not have compartment syndrome. This case turns solely on the one issue of cause, and that is there is no medical evidence of cause. There is no question at trial, which is typically, Dr. Petowitz, do you have an opinion to a reasonable degree of medical probability or certainty that the actions or inactions of Nurse Plant caused the plaintiff's injury? There is no question. There is no question at trial. There is no report that was submitted under the Rule 26 disclosures. Nothing. And then the patient doesn't even receive a final diagnosis for three more days. And the reason that is, is because Dr. Petowitz could not provide expert testimony or opinions that what Nurse Plant did or didn't do at 4 o'clock in the morning caused this injury. Well, the testimony, was it of Dr. Petowitz where he makes reference to the team, what the team did or didn't do? He does, but he doesn't specifically say what the team caused. He just says team. And, again, that's not proper expert testimony. If you have an inference, which is what the court suggested, an inference of evidence, you still have an inference of causation. You still must have evidence, specific evidence, and that's not here. And there's no evidence in this case that Dr. Janes testified that had he been called at 4 a.m. he would have come to the hospital and done a check at 4.30 in the morning. There's no evidence of that. Dr. Janes didn't testify at trial. Dr. Petowitz didn't provide any opinions at trial regarding that. And that's why we believe judgment should have been entered in our favor because, truly, Your Honors, this was not a simple medical condition. This is compartment syndrome. It's a very complicated orthopedic injury. The procedures to remedy it are very complicated. This is not something a nurse can treat. Procedures to diagnose it, however, are not quite that complicated, are they? Oh, they're very complicated. And there was testimony about how complicated it is. Well, it's, you know, can you move your toes? Can you move your ankle? I mean, we've all been through situations where we've had that kind of diagnosis, if you will. And if you have nurses reporting up the chain to, say, to doctors or PAs, they can't move the toes, can't move the ankle, something would happen, would it not? Correct. And there was testimony that the nurses reported that to Dr. Janes. That's why they pulled him off the floor to say, look at this patient. We think there's been a change. Respectfully, Your Honor, though, there are other diagnoses that need to take place to determine compartment syndrome, not just whether someone can move their toes or ankle. Was there any assertion at trial that the nurses solely were 100% responsible for the negligence? No, Your Honor. There was no evidence of that. At no point in time was there any evidence at trial that the nurses were 100% at fault for causing this man's injury. And I know you have a lot of issues here, but one of your issues, I think, is instructions. And the instructions pertain to 100% liability for the nurses? Yes. The court modified the Greenmeier instruction. Your Honor, a portion of it was taken out, and what was kept in is they must award full damages to the plaintiff based on the evidence that they presented at trial as to the nurses. We objected to that instruction because we felt we should get apportionment. The court said no, and that's what's brought us here today. Thank you, Your Honors. Thank you. Thank you all for your arguments this morning. The case is submitted.